UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL ANDERSON,

    Petitioner,

VS                                        CASE NO. 5:04cv164-RS

AL SOLOMON, et al.,

    Respondents.

**ORDER**

This cause is before the Court upon the Magistrate Judge's Report and Recommendation (Document 16) and the Petitioner's Objections (Document 20) to the Magistrate Judge's Report and Recommendation. The Court addresses the Petitioner's Objections:

**1. No Notice of Regulation**

In his Objections to the Magistrate Judge's Report and Recommendation ("Objections"), Anderson does not dispute the Magistrate Judge's statement of law on this issue. Appropriately citing Radi v. McCormick, 978 F.2d 715, *3-*4 (9th Cir. 1992) (Table, Text in Westlaw), the Magistrate Judge asserted that a prisoner need not "actually [know] of the [prison] regulation" in order for due process to be satisfied but that due process is also satisfied where prison officials make such regulations "available to him" (Doc. 16, p. 11). Anderson does dispute, however, the Magistrate Judge's application of the law to the facts of his case. The Magistrate Judge concluded that Anderson was afforded due process because the prison rules and regulations were

Entered On Docket: _____ By: _____
Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP
Copies mailed to: _____

Document No.

available to him in the prison library.  (Doc. 16, p. 12).  While Anderson admits that the rules and regulations were available in the prison library, he argues that such notice is insufficient to satisfy due process and does not approach the degree of notice that was present in Radi (Doc. 20, pp. 3-4).  In Radi, not only were the rules and regulations available in the prison library, but inmates were also provided notice of the rules and regulations through other methods: "inmate orientation, rule books available in the prison library and guard offices, the orientation handbook, and the prison newspaper." Radi, 978 F.2d at *3.  Anderson asserts that these additional forms of notice were not available to him (Doc. 20, pp. 3-4).  Therefore, Anderson argues that the holding in Radi cannot properly be applied to the facts of his case.

      Whether or not the rules and regulations were sufficiently available to Anderson need not be addressed by the Court, for evidence from the record indicates that Anderson had actual knowledge of the specific rule in question which he admits to having violated.  "While it may be difficult to prove the existence of actual knowledge on the part of one who denies it (because in such case direct evidence is not attainable unless he admits it), nevertheless, even actual knowledge can be demonstrated by the proof of circumstances which will admit of no other reasonable conclusion than that the party who asserts his ignorance of a given fact actually knew it, and that his denial is untrue." Wiley v. Rome Ins. Co., 76 S.E. 1067, 1069 (Ga. Ct. App. 1913).  Here, Anderson asserts that he was not aware of, nor did he have the fair opportunity to become aware of, a rule requiring him to obey a direct order from a prison officer. However, circumstances suggest an alternative conclusion.  Approximately one year prior to the date of the rule violation, Anderson signed a document entitled "Restricted Labor and Field Force Squad Inmate Orientation" ("Orientation Document") acknowledging that "I have read, or have had the rules read to me, the rules of conduct. A staff member has explained each rule to me and I understand completely what is required of me while assigned to the Restricted Labor or Field Force Work Squad" (Doc. 1, p. 97-98).  Section II.E. of the Orientation Document states that "Inmates will perform assigned duties until instructed by staff to stop."

      By signing the Orientation Document, Anderson explicitly acknowledged his obligation to perform all assigned duties.  Here, it is undisputed that a prison officer

2

ordered Anderson to carry a water cooler during Field Force Squad activities. In doing so, the prison officer "assigned" Anderson the duty of carrying the water cooler. Anderson refused to obey the order. When Anderson refused to obey the order, he violated the very rule which he acknowledged having read.

Anderson offers the following arguments in support of his decision to ignore the prison officer's order: (1) Anderson was not required to obey the prison officer because Anderson had already been assigned the task of "liming potatoes"; (2) the task of carrying the water cooler was also another prisoner's assigned duty; and (3) carrying a water cooler is not the type of duty that is typically assigned to "close or medium custody" inmates such as Anderson. These arguments are unpersuasive. Section II.E. of the Orientation Document does not restrict or qualify the power of a prison officer to assign additional or modified duties to an inmate, nor should it be so interpreted. See Bell v. Wolfish, 441 U.S. 520, 546-48 (1979) (substantial deference should be given to prison officials in conducting the day-to-day operations of prison facilities and in managing inmates in order to preserve internal order, discipline, and institutional security). When Anderson signed the Orientation Document, Anderson explicitly acknowledged his obligation to perform any and all tasks that are assigned to him by prison officials. That Anderson chose to ignore the prison officer's order does not speak to Anderson's lack of notice regarding this particular prison rule although Anderson pretextually frames the issue as such; rather, Anderson's decision to ignore the prison officer's order speaks to Anderson's general lack of respect for authority. This lack of respect for authority is evidenced by the Disciplinary Report. The Disciplinary Report indicates that Anderson was adjudged to have violated the following rules prior to the rule violation in this case: (1) disrespect towards officials, (2) failure to comply, (3 & 4) theft (two violations on separate occasions), (5) possession of contraband, (6) refusing to work, (7) lying to staff, (8) disobeying order, (9) inciting riots, (10 & 11) disorderly conduct (two violations on separate occasions), (12) obscene profane act, (13) destruction of state property, and (14) being in an unauthorized area (Doc. 11, Exhibit N).

Further, the Court refuses to give credence to Anderson's claimed belief that "It was my understanding that I could not be ordered to do another inmates (sic) assigned

duty therefore (sic) I was not required to follow Ofc (sic) Johnson's order no matter how many times he repeated it" (Doc. 1, p. 6). How Anderson, an inmate who has been incarcerated for a number of years, could possibly believe that a prison officer lacked the authority to order him to perform a task as simple and as ministerial as carrying a water cooler during Anderson's assigned work time is unfathomable. In fact, the state court concluded, and appropriately so, that Anderson's claim was "disingenuous." Because the Court has determined that the evidence sufficiently indicates that Anderson had actual knowledge of his obligation to comply with the prison official's order to carry a water cooler, the Court need not address Anderson's arguments related to lesser forms of notice such as "posting" and whether or not the rule was sufficiently "available" to him for inspection.

### 2.  Unconstitutionally Vague

In his Objections, Anderson also asserts that the "obey-all-orders rule as applied to him was unconstitutionally vague" because "inmates must guess as to it's (sic) meaning" (Doc. 20, p. 7). More specifically, Anderson argues that the rule requiring prisoners to obey the orders of prison officials fails to clearly convey to prisoners when the rule can be disobeyed (Doc. 20, p. 8). Anderson, however, specifically notes that he is "not asking this Court to consider the vagueness of the 'obey-all-orders' rule on it's (sic) face." (Doc. 20, p. 6). The Court "therefore need not determine whether [the rule] is unconstitutionally vague in all its possible applications, nor need [the Court] decide whether in some application it might inhibit the exercise of constitutionally protected rights." Adams v. Gunnell, 729 F.2d 362, 369 (5th Cir. 1984) (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497-99 (1982); United States v. Powell, 423 U.S. 87, 92 (1975)). Instead, the Court must consider "whether the catch-all rule is impermissibly vague as applied to the conduct of this [specific Plaintiff] - that is, whether [Anderson] had fair warning that [his] conduct was proscribed." Adams, 729 F.2d at 369.

Here, Anderson had fair warning that disobeying a prison officer's order instructing him to carry a water cooler during his assigned work time was proscribed. Although Anderson argues that the "obey all orders" rule was ambiguous to him

4

because it failed to articulate precisely when he was permitted to disobey the rule, Anderson interestingly demonstrates the clarity of the rule when he easily answers his own question. Anderson asserts that a prisoner can disobey an order when the order requires the prisoner to perform an "illegal" task (Doc. 20, p. 7). Although Anderson claims that "inmates must guess as to which orders could be . . . illegal," he then contradicts this assertion by actually defining the term "illegal" himself. Quoting its definition from a common dictionary, Anderson states, "Illegal in it's (sic) plain and ordinary terms means '1. forbidden by law or statute.  2. contrary to or forbidden by official rules or regulations.' Webster's Universal College Dictionary, Random House (sic), 1997" (Doc. 20, p. 7). Anderson admits that "the majority of the verbal orders given by D.O.C. officials are lawful ones . . . there are, however, situations (such as this one) where inmates will speculate as to whether or not an order is unlawful or contrary to official rules or regulations. And in those situations inmates must guess as to whether or not their contemplated conduct is proscribed" (Doc. 20, p. 8). Here, however, Anderson was not required to "speculate" as to whether the order was unlawful or contrary to official rules or regulations. First, Anderson does not allege that the prison officer's order was "forbidden by law or statute" because such an argument would be nonsensical. There is no evidence that any law or statute in the state of Florida or in the United States forbids a prison officer from ordering a prison inmate to carry a water cooler. Second, it was clear to Anderson that the prison officer's order was not "contrary to or forbidden by official rules or regulations" because as previously discussed, Anderson had "actual knowledge" of his obligation to perform all tasks that were assigned to him by prison officials, including the simple task of carrying a water cooler during his assigned work time.

     Anderson next asserts that because he is a "rational actor," fairness requires him to be "fully informed as to whether his proposed action is illegal or legal" and that he had to "speculate whether he could refuse to perform a task normally carried out by other specifically assigned inmates"  (Doc. 20, p. 9). If Anderson truly is a "rational actor" as he claims to be, a "rational actor" in a prison setting would "speculate" conservatively, erring on the side of caution and obedience when given a simple order, especially when no argument can be made that the order violates a law or statute. This Anderson did

not do. Instead, Anderson either took a gamble that his interpretation of the law would insulate him from discipline, or more likely, Anderson simply acted on impulse and chose once again to ignore an order from a prison official. Anderson erroneously concludes that "His speculation . . . was clearly caused by the vague rule . . . " (Doc. 20, p. 9). On this point, the Court will correct Anderson. Anderson's "speculation" and refusal to obey an order were not caused by any rule; rather, Anderson's speculation and refusal to obey an order were caused by Anderson's own free will, a free will which obviously refuses to obey authority and to accept responsibility for its actions.

     Anderson's reliance on Adams v. Gunnell, 729 F.2d 362 (5th Cir. 1984) is misplaced. The Adams Court held that "basic due process was violated by the eventual imposition of severe punishment for conduct no inmate could have known was against prison rules." Id. at 370. In Adams, however, the Court stated that "The record reveals absolutely no circumstance that might have given Adams or Darcy reason to suspect that writing, signing, or even circulating a petition among the inmates would subject them to punishment . . . There is no evidence that any inmate had ever before been punished in connection with a petition." Id. at 360 (Emphases added). Here, the facts are clearly distinguishable. Anderson does not argue that a prisoner has never been punished for disobeying an order from a prison officer. In fact, Anderson possesses firsthand knowledge that prisoners are punished for disobeying the orders of prison officers because he himself has been so punished. Prior experiences should have alerted Anderson to the potential consequences for disobedience. In essence, the "catchall regulation" requiring inmates to "obey all orders" was not vague to Anderson because it had been "given content by prior instances of discipline" that should have alerted Anderson to the consequences of failing to comply with an order. Cf. Waters v. Peterson, 495 F.2d. 91, 99-100 (D.C. Cir. 1973).

     Also pertinent to its holding that due process was denied in Adams, the Fifth Circuit explained:

> Nor is there anything about signing or circulating a petition itself that might suggest a prohibition. Despite the defendants' assertions, the record contains nothing to indicate that Adams or Dancy coerced or threatened other inmates in connection with the petition. The most that can be said is that the IDC had evidence not present in our record that the plaintiffs had a part

>in writing and circulating the petition. Unlike otherwise illegal conduct or <u>acts of clear disobedience or insubordination</u>, such participation in a petition 'does not carry with it its own warning of wrongdoing.'

<u>Adams</u>, 729 F.2d at 369 (<u>quoting Shawgo v. Spradlin</u>, 701 F.2d 470, 478 (5th Cir. 1983)) (Emphasis added).

Here, unlike the situation in <u>Adams</u>, Anderson's conduct carried with it "its own warning of wrongdoing." According to the Disciplinary Report Worksheet that was filed by the reporting officer, Anderson was instructed to carry the water cooler. In response to the officer's order, Anderson stated to the officer, "I'm not carrying the water cooler. You carry it." Anderson was then instructed twice by the prison officer to carry the cooler. Anderson refused stating, "You carry the fucking cooler" (Doc. 11, Exhibit B). Thus, in contrast to the petition in <u>Adams</u> that was described by the Fifth Circuit as being "gentle," Anderson's conduct and words were far from gentle; rather, they were clearly disobedient and insubordinate. Anderson's words and conduct carry with them their own "warning of wrongdoing." Anderson, as a "rational actor," should have known that disobeying a simple order from a prison officer and commanding the prison officer to perform a task himself would result in disciplinary action. In fact, Anderson's conduct may have given rise to at least one alternative basis for imposing disciplinary action against him, namely, "showing disrespect towards officials."

Anderson's argument that he did not know that he was required to follow the prison officer's order because he had "never once witnessed any other inmates perform 'water boy' tasks or be ordered to perform 'water boy' tasks other than those specifically assigned 'water boys'" is illogical (Doc. 20, pp. 10-11). For if prison officials can assign duties to prisoners in the first place, prison officials can also reassign duties to inmates. That Anderson was assigned a specific duty of "liming potatoes" does not prevent prison officials from altering the status quo at any time. Although Anderson may take issue with this reality, employees are frequently subjected to similar treatment from their employers in the corporate world and must learn to adapt. For if an employee refuses to obey an order from his or her employer, the employee may suffer consequences of his own including termination from employment. Surely Anderson is not suggesting to the Court that he, a prisoner, deserves preferential treatment. In summation, because

7

Anderson had fair warning that his refusal to obey an order from a prison officer was proscribed, the "obey all orders" rule is not unconstitutionally vague.

### 3. Right to a Warning

Finally, Anderson argues that when he refused to obey the first verbal order, he should not have been punished unless he was first warned that discipline would be imposed for failing to comply. Allegedly, such a warning would have given Anderson the opportunity to comply with the prison officer's order so as to avoid the imposition of disciplinary measures. Anderson bases this argument on two cases, Meis v. Gunter, 906 F.2d 364 (8th Cir. 1990) and Forbes v. Trigg, 976 F.2d 308 (7th Cir. 1992). Anderson's reliance on both cases is misplaced. The Eighth Circuit in Meis set forth a hypothetical fact pattern in order to exemplify the appropriate situation in which a prisoner should be given a warning prior to imposing disciplinary sanctions:

> If, for example, a [rule] makes it an offense for an inmate to have in his cell more than three books, and if an inmate, not knowing of the [rule], has four books in his cell, and if an officer, upon discovering the four books, institutes disciplinary proceedings against the inmate without first informing him of the three-book limit and giving him a chance to get rid of the fourth book, obvious problems of due process arise. There has been no fair notice of what is prohibited.

Meis, 906 F.2d at 367.

The Meis Court then applied this hypothetical to its own case. The court stated that "The difficulty, so far as the present case is concerned, is that the proposition is a complete abstraction. Nothing of the kind has ever happened to Meis." Id. Similarly, the Forbes Court concluded that "Despite Forbes' allegations, he has not been subject to this kind of draconian handling." Forbes, 967 F.2d at 314 (citing Coffman v. Trickey, 884 F.2d 1057 (8th Cir. 1989)).

Here, like Meis and Forbes, Anderson was not entitled to a warning by the prison officer. The hypothetical fact pattern set forth by the Eighth Circuit in Meis concerned a trivial, obscure rule that a prisoner would not be expected to know absent prior warning. No prisoner would know, absent information, that having four rather than three books in one's cell was proscribed by prison rules and that violating the rule would lead to disciplinary action. Accordingly, fairness would mandate that a prisoner be informed of

8

such a rule and the consequences for disobeying it.  In Anderson's case, however, a rule requiring an inmate to obey a harmless rule from a prison officer during work time is not obscure.  In fact, unlike the purely technical rule that was set forth by the <u>Meis</u> Court in its hypothetical fact pattern, the rule requiring Anderson to obey an order from a prison officer is obvious and commonly known throughout the prison community.  In <u>Ard v. Hanks</u>, 67 Fed Appx. 946, 949 (7th Cir. 2003), the Seventh Circuit clarified that:

> [<u>Meis</u> and <u>Forbes</u>] noted only that due process requires prison authorities to inform a prisoner of a technical rule before punishing him for violating it.  Here, Ard was disciplined not for violating an obscure or technical rule but for beating another person in the face, an act everyone knows is against the law.

Everyone, including Anderson, knows that disobeying an order from a prison officer <u>may</u> result in disciplinary action.  The Supreme Court itself has held that "Due process does not require specific notice of a rule prohibiting an act commonly known to be unlawful."  <u>United States v. Freed</u>, 401 U.S. 601, 609 (1971).  Thus, rather than supporting Anderson's case, <u>Meis</u> and <u>Forbes</u> support only the argument that Anderson was not entitled to a warning before disciplinary sanctions were imposed.

Anderson's argument that a warning would have given him the opportunity to comply with the prison officer's order so as to avoid disciplinary action is likewise unpersuasive.  The prison officer instructed Anderson to carry the water cooler not once, not twice, but <u>three</u> times (Doc. 11, Exhibit B).  Anderson was given ample opportunity to comply with the prison officer's order.

## CONCLUSION

Petitioner was on notice that he was required to obey orders.  The regulation setting out the requirement was not unconstitutionally vague.  Petitioner had fair warning that his refusal to obey the order could result in punishment.

Accordingly,

1. The Magistrate Judge's Report and Recommendation (Document 16) is adopted and incorporated by reference in this Order.

2.   The Petition for Writ of Habeas Corpus (Document 1) is denied.

9

3.  The Clerk is ordered to close the file.

ORDERED on December 9, 2005.

                                      <u>/s/ Richard Smoak</u>
                                      RICHARD SMOAK
                                      UNITED STATES DISTRICT JUDGE